Filed 12/6/22 P. v. Sapienza CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077714 |
| v. | (Super.Ct.No. SWF1500341) |
| JEFFREY EDWARD SAPIENZA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. F. Paul Dickerson III, Judge. Affirmed.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

1

On remand from this court, the court below found defendant and appellant, Jeffrey Edward Sapienza, ineligible for a mental health pretrial diversion program pursuant to Penal Code section 1001.36.[1] On appeal, defendant contends the court abused its discretion. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

In January 2015, the victim drove into his mobilehome park, where defendant waved him down. The victim rolled down his window and asked if he could help defendant. Defendant said the victim was not a man of his word; defendant said something about the victim owing defendant $20. The victim assumed defendant was talking about $20 that defendant's mother had lent the victim. (*Sapienza*, *supra*, E070547.)

The victim exited his car. Defendant yelled: "'Give me your money or I'm gonna get it from you.'" Defendant quickly approached the victim and touched his nose to the victim's nose and his chest to the victim's chest. Defendant told the victim to give him the money or he was going to hurt and kill the victim. The victim was afraid of defendant. (*Sapienza*, *supra*, E070547.)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] On February 4, 2022, we granted defendant's request for judicial notice of the record in defendant's appeal from the original judgment. (*People v. Sapienza* (Feb. 18, 2021, E070547) [nonpub. opn.] (*Sapienza*); Evid. Code, §§ 452, subd. (d), 459; Cal. Rules of Court, rule 8.1115(b)(1).) Defendant attached the opinion in case No. E070547 to his motion for Penal Code section 1001.36 relief and both parties on appeal rely on the opinion for their recitation of the facts. We derive much of our factual and procedural background from that opinion.

The victim told defendant he had already paid the money back to defendant's mother. Defendant pointed out a car nearby and said: "'You see the [B]lack guy there inside the car? All I have to do is call him, and he'll do it for me.'" The victim "really got very scared." He interpreted defendant's words as a threat to have the man kill him. (*Sapienza*, *supra*, E070547.)

The victim told defendant he was going to call the mobilehome manager and the police. Defendant told him: "'Go ahead.'" The victim got into his car and drove off. He did not return home because he was afraid of alerting the man with whom defendant had threatened him as to the location of his residence. Instead, the victim parked, went to the manager's office, and told her what had occurred. The manager then called the police. (*Sapienza*, *supra*, E070547.)

The victim testified that two nights prior to the incident, he found defendant parked in front of his home at 2:00 a.m. The victim was worried because he had been burglarized on several occasions. In May 2016, the victim called the police because defendant contacted him; the victim had a restraining order against defendant.[3] (*Sapienza*, *supra*, E070547.)

The People charged defendant by second amended felony complaint with attempted robbery (§§ 664, 211, count 1), two counts of criminal threats (§ 422, counts 2 & 4), misdemeanor elder abuse (§ 368, subd. (c), count 3), and failure to appear (§ 1320.5, count 5). The People additionally alleged defendant had committed the

---

[3] At this point, the court recessed the preliminary hearing, which formed the factual basis for defendant's subsequent plea. (*Sapienza*, *supra*, E070547.)

3

charged offenses while defendant had been released from custody. (§ 12022.1.) (*Sapienza*, *supra*, E070547.)

The People and defendant apparently came to a resolution that involved the instant case, four misdemeanor cases, and an admission to a violation of probation. On August 31, 2015, in the instant case, defendant pled guilty to criminal threats (§ 422, count 2). (*Sapienza*, *supra*, E070547.)

The People agreed that defendant "could be accepted into an appropriate dual diagnosis residential treatment program . . . ." Defendant would be required to provide proof that the program had accepted him; if admitted to a rehabilitation program, the court would modify the sentence, release defendant to the program, and allow him to spend the balance of his jail time in the program. On August 31, 2015, the court imposed the upper term of three years, execution of which the court suspended on the condition that defendant successfully complete the terms and conditions of three years of formal, felony probation. (*Sapienza*, *supra*, E070547.)

At a hearing on September 24, 2015, the parties confirmed that defendant had been admitted to a rehabilitation program. Upon defendant's agreement, the court ordered defendant released from jail the next day to complete the balance of his custody time in the residential treatment program. The court noted, "I'm going to give you the opportunity to get clean and sober." (*Sapienza*, *supra*, E070547.)

On April 5, 2016, the People filed a misdemeanor complaint and petition for revocation of defendant's probation alleging he had resisted arrest. (§ 148, subd. (a)(1).) At a hearing on May 24, the court observed: "I . . . have this document he's in inpatient

4

care at Pacific Grove Hospital." Defendant's attorney stated defendant was "on a psychiatric hold."[4] The court noted that the letter indicated defendant would not be released from the hospital until June 3; defense counsel confirmed this. The court issued a bench warrant, but held it until the second week of June, ordering defendant to appear on June 9. (*Sapienza*, *supra*, E070547.)

On June 9, 2016, the People informed the court that they had obtained a letter reflecting defendant had been admitted to a hospital the day before, with an undetermined release date. Defense counsel stated the reason for the hospitalization "seems to be possibly schizophrenia, for all I know."[5] The court continued the matter and held the warrant until June 21. (*Sapienza*, *supra*, E070547.)

On January 5, 2018, the court held a hearing on the petition to revoke defendant's probation. A police officer testified that on March 31, 2016, he responded to a call regarding "a male acting strangely and being aggressive and loud at the bank." When he arrived, he encountered defendant, who was pacing back and forth in front of the bank yelling. Defendant did not appear to have mental issues but appeared to be agitated. (*Sapienza*, *supra*, E070547.)

The officer obtained defendant's name and date of birth; he conducted a records check of defendant. The officer discovered defendant was on formal, felony probation

---

[4] The letter to which the court referred did not reflect that the hospital was a psychiatric hospital and did not indicate why defendant had been admitted, only that he had been admitted to the hospital.

[5] Again, the letter from the hospital did not reflect that it was a psychiatric hospital or that defendant was admitted for any psychiatric condition.

5

with search terms and that his driver's license had expired on October 22, 2012. The officer found a vehicle associated with defendant and conducted a record check on it. The vehicle had no license plates and was registered to defendant's mother. (*Sapienza*, *supra*, E070547.)

The officer told defendant he could not drive any vehicle because his license was expired; defendant acknowledged that he could not drive until he had his license reinstated. The officer contacted defendant's mother, who agreed to come drive the vehicle home. He advised defendant to wait for his mother, which defendant agreed to do. The officer left. (*Sapienza*, *supra*, E070547.)

Five minutes later, the officer received a call advising him that defendant had driven the vehicle away. The officer drove to defendant's mother's home. A few minutes later, defendant pulled into the mobilehome park in his mother's vehicle. (*Sapienza*, *supra*, E070547.)

The officer ordered defendant to stop and get out of the car. Defendant yelled: "'Not this time, Cop.'" Defendant backed away and drove off. The officer quickly found the vehicle parked at the south end of the mobilehome park, adjacent to a golf course; defendant was not in the car. The officer saw defendant running down an embankment onto the golf course. He gave chase and ordered defendant to get on the ground. Defendant eventually complied. Defendant physically resisted while the officer attempted to handcuff him. The officer and his partner had to drive their patrol car onto the golf course because defendant refused to walk. (*Sapienza*, *supra*, E070547.)

6

Defendant's counsel argued defendant was suffering from mental health issues and, therefore, should be returned to probation. The People noted, "there has been no evidence of any kind of mental health issues that he suffers from." The court also observed that there "really was no evidence during the violation hearing" of mental health issues. The court found defendant had violated the terms of his probation.[6] The court then indicated a tentative decision to impose the suspended sentence but observed "there is some history of some type of either mental or substance abuse disorder[s]." The court continued the matter for sentencing. (*Sapienza*, *supra*, E070547.)

On March 23, 2018, defense counsel filed a mitigation letter alleging defendant suffered physical disabilities, including a frontal lobe injury, and posttraumatic stress disorder. Defense counsel attached to the mitigation letter an unsigned letter alleging defendant had been admitted to a hospital on June 18, 2016, "on an involuntary basis for treatment of profound levels of depression with [an] active suicidal plan and intent [*sic*] with the patient also reporting onset of auditory hallucinations." At the hearing on the same date, the court imposed the suspended sentence of three years of imprisonment and awarded defendant 903 days of total custody credits. (*Sapienza*, *supra*, E070547.)

Defendant appealed, contending the matter should be conditionally reversed and remanded to the trial court to determine, retroactively, whether defendant qualified for a pretrial diversion program for individuals diagnosed with qualifying mental disorders pursuant to then-recently enacted section 1001.36 (Stats. 2018, ch 34, § 24). By

---

[6] On the same day, defendant entered a plea to the court in another misdemeanor case and admitted a violation of probation in yet another case.

7

published opinion filed August 23, 2019, we affirmed, holding that because the court had imposed sentence on August 31, 2015, defendant's judgment was long since final, rendering him ineligible for retroactive application of section 1001.36. (*Sapienza*, *supra*, E070547.)

The California Supreme Court subsequently directed us to vacate our opinion and reconsider the cause in light of *People v. McKenzie* (2020) 9 Cal.5th 40. By opinion filed February 18, 2021, we conditionally reversed and remanded the matter for a section 1001.36 hearing. (*Sapienza*, *supra*, E070547.)

On April 28, 2021, defendant filed a request to be admitted to mental health diversion pursuant to section 1001.36. Defendant alleged he had begun receiving mental health treatment from Samer Kamal, M.D., in late 2019, with "major depression and psychotic disorder, which has been characterized by grandiose delusional thinking." Defendant argued that the report of defendant's crimes "clearly describes a person who suffers from the symptoms of the mental disorders with which [defendant] has been diagnosed." "Dr. Kamal expressly states in his opinion letter that [defendant] has made tremendous progress with his treatment, and that [defendant] does not have a history of physically assaultive or violent behaviors. This implies that [defendant's] mental disorders are the culprit to blame for his involvement in the commission of the charged offense." "On the date of the second offense, March 1, 2020, [defendant] had only been in treatment for a short time."

Defense counsel also contended that defendant did not pose an unreasonable risk of danger to public safety because his criminal history lacked any physically assaultive or

8

violent behavior. Defendant attached a letter from Dr. Kamal reflecting he did not believe defendant was a threat to society.

On June 21, 2021, the People filed an opposition to defendant's request, arguing defendant had failed to establish eligibility: "Dr. Kamal . . . began treating . . . defendant about [four] years *after* . . . defendant committed the offenses charged . . . in 2015." "There is no evidence that any mental health disorders were a significant factor in the commission of the charged crimes or substantially contributed to the defendant's involvement in the commission of the offenses." "Dr. Kamal's letter does not address the defendant's mental health disorders or symptoms at the time of the charged crimes or how they may be treated. Nevertheless, when the defendant was placed on probation in this case, he was ordered to serve 196 days through Recovery Network Resources at Tibis House, and he enrolled in Tibis House from September 25, 2015 to February 18, 2016. The program provided residential drug and alcohol treatment, counseling, medical and psychiatric services, and medication management. Even after participating in this structured treatment program for several months, . . . defendant re-offended multiple times in 2018, 2019, and 2020. Thus, community resources have not adequately addressed . . . defendant's condition in the past and cannot sufficiently do so now either."

"[D]efendant's criminal history as well as his conduct in the current case show that he poses an unreasonable risk of danger to public safety if treated in the community. Contrary to the defense's argument and Dr. Kamal's opinion, the defendant does have a history of physically assaultive behavior as well as a history of threatening to physically harm others, including with a weapon." The People relayed defendant's criminal history,

9

which included convictions for misdemeanor spousal battery (Pen. Code, § 243, subd. (e)(1)), four misdemeanor convictions for violations of protective orders (Pen. Code, § 273.6, subd. (a)), a conviction for misdemeanor driving with a suspended license (Veh. Code, § 14601.1, subd. (a)), one conviction for misdemeanor criminal threats (Pen. Code, § 422), one for misdemeanor resisting arrest (Pen. Code, § 148, subd. (a)(1)), another for misdemeanor exhibition of a deadly weapon (Pen. Code, § 417, subd. (a)(1)), one for felony criminal threats (Pen. Code, § 422), and a then pending charge of criminal threats (Pen. Code, § 422).

At the hearing on August 10, 2021, the court indicated it had "read and considered [defendant's] request for mental health diversion and [the] opposition thereto." The court found that "defendant committed the offense while being treated by Dr. Kamal for mental health problems and he was on probation at the time.[7] The court "finds he would not respond to mental health diversion treatment." The court further found that "given the nature of the charges and his extensive criminal history, the Court believes [defendant] does pose an unreasonable risk of danger to the public if treated in the community." The court denied defendant's request for mental health diversion.

---

**7** As both parties observe, it would appear the court was conflating the instant case with defendant's two then pending cases in which defense counsel was also requesting section 1001.36 diversion. This is because the offense for which defendant stands convicted in this case derives from 2015, well before Dr. Kamal started treating defendant in "late 2019."

## II. DISCUSSION

Defendant contends the court abused its discretion in finding him ineligible for a section 1001.36 diversion program. We disagree.

"Section 1001.36 authorizes a pretrial diversion program for defendants with qualifying mental disorders. The statute defines "'pretrial diversion'" as 'the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . .'" (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).)

"[A] trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community." (*Frahs*, *supra*, 9 Cal.5th at pp. 626-627.)

"As to the sixth criterion, '[s]ection 1170.18 . . . defines "unreasonable risk of danger to public safety" as "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." [Citation.] The violent felonies encompassed in this definition "are known as 'super strikes' and include murder . . . ."'" (*People v. Pacheco* (2022) 75 Cal.App.5th 207, 213.)

"If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion." (*Frahs*, *supra*, 9 Cal.5th at p. 627.)

"'If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion' and 'the arrest upon which the diversion was based shall be deemed never to have occurred.'" (*Frahs*, *supra*, 9 Cal.5th at p. 627.) "[S]ection 1001.36 applies retroactively to all cases not yet final on appeal." (*Frahs*, at p. 632.)

"Ultimately, however, diversion under section 1001.36 is discretionary, not mandatory, even if all the requirements are met. [Citations.] We therefore review for abuse of discretion the trial court's decision whether to grant a request for mental health diversion. [Citation.] 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence.'" (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080.) "'It is [defendant's] burden on appeal to establish an abuse of discretion and prejudice.'" (*People v. Pacheco*, *supra*, 75 Cal.App.5th at p. 213.)

The court below acted within its discretion in finding defendant ineligible for mental health diversion. First, defendant failed to provide any evidence that he suffered

12

from qualifying mental health issues when he committed the instant offense in 2015. Dr. Kamal reported that he had been treating defendant only "since late 2019." He noted defendant's mental health issues "have led to [defendant] making apparently threatening statements." However, the threatening statements Dr. Kamal associated with defendant's mental health issues were those that were the subject of the then-pending 2020 charged offense, not the offense defendant committed in 2015.

Second, even if defendant did suffer from qualifying mental health issues in 2015, he failed to provide any evidence those issues played a significant role in the commission of the offense in the instant case. Dr. Kamal opined only about the offense committed in 2020. Third, defendant failed to provide a recommended program of mental health treatment that would meet his specialized mental health treatment needs. (*Frahs*, *supra*, 9 Cal.5th at p. 627 [trial court must be "satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant"].)

Fourth, there was ample evidence to support the court's conclusion that defendant "would not respond to mental health diversion treatment." As the People note, defendant's criminal record belies Dr. Kamal's statement that defendant had "no history of any physically assaultive behavior." Defendant had a previous conviction for spousal battery.

Defendant's criminal history also included multiple convictions for offenses that he committed during or after he was under some form of supervision or court order. Defendant had incurred four misdemeanor convictions for violations of protective orders.

13

The instant case concerns, in part, defendant's violation of his probation. Defendant underwent mental health treatment, yet continued to reoffend. In August 2019, defendant violated his parole by committing another offense of criminal threats. The most recently charged offense occurred while defendant was undergoing treatment with Dr. Kamal; he was also on both probation and parole. The court had before it substantial evidence to conclude that defendant would neither comply with nor benefit from any mental health treatment plan.

Finally, even if the court erred in determining that defendant was likely to commit a super strike offense, any one of the reasons listed, *ante*, would more than support the court's exercise of its discretion to deny defendant mental health diversion. (*People v. Gerson, supra*, 80 Cal.App.5th at p. 1080 ["[D]iversion under section 1001.36 is discretionary, not mandatory, even if all the requirements are met."].) Thus, the court acted within its broad discretion in denying defendant's request for mental health diversion.

Defendant maintains that the court's reliance on Dr. Kamal's letter, rather than the mitigation letter filed in June 2016, alone warrants reversal. However, defendant did not attach the June 2016, mitigation letter to his request for diversion or reference it in his argument below;[8] instead, he attached Dr. Kamal's letter to the request and referenced it in his argument. The court cannot be faulted for relying on what defendant submitted and argued in support of his request instead of something he did not.

---

[8] Defendant did attach, to his request, this court's opinion in *Sapienza, supra*, E070547, which references the mitigation letter.

Moreover, the mitigation letter was unsigned, did not reflect on defendant's mental state when he committed the offense in 2015, did not connect defendant's mental health issues with his commission of the offense in 2015, did contain an opinion defendant's symptoms would respond to mental health treatment, did not include a mental health treatment plan, did not indicate defendant would comply with treatment, and did not reflect defendant would not pose an unreasonable risk of danger to public safety if treated in the community. (*Sapienza*, *supra*, E070547.) Furthermore, the mitigation letter was five years old when the court considered defendant's request for diversion. Finally, defendant did receive mental health treatment after the mitigation letter but continued to reoffend.

Defendant also argues that since the same court which denied defendant's request for diversion in this case on August 10, 2021, granted defendant's request for mental health diversion in another case approximately six months later, there would be no reason to believe defendant would not be appropriate for diversion in this case.[9] However, we have none of the documents that supported the court's ruling in that case. We would assume that, at minimum, in that case defendant submitted documentation from a licensed mental health practitioner that defendant was suffering from a qualifying mental health disorder, which contributed to the commission of the offense in that case, which outlined a mental health treatment plan, that the mental health practitioner opined would

---

[9] This court granted defendant's request for judicial notice of a Superior Court of Riverside County minute order in case No. SWF2077182, which reflects that the same court in this case granted defendant's request for mental health diversion on February 15, 2022.

meet defendant's specialized mental health treatment needs, and to which defendant agreed to participate. This is precisely what is lacking in this case.

## III. DISPOSITION

The order denying defendant's request for mental health diversion is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:

FIELDS

J.

RAPHAEL

J.